| Case No. 23-35606 |

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

William C. Schroeder,

Appellant,

vs.

United States of America,

Appellee.

Appeal from United States District Court
for the Eastern District of Washington

# APPELLANT'S REPLY BRIEF

William C. Schroeder
**KSB Litigation, P.S.**
510 W. Riverside Ave., Ste. 300
Spokane, Washington, 99201
(509) 624-8988
wcs@KSBLit.legal
Appellant
WSBA #41986
MSB #11963

# Table of Contents

**SUMMARY** ................................................................................................ 5

**SUPPLEMENTAL HISTORY** ................................................................. 9

  **A. The Original Intent of The Framers of Article I Was For Every House Member To Represent The Same Number Of Residents, As Congress Demonstrated Following Each Census Until the Civil War.** ......................... 9

  **B. The Original Intent of the Framers of the Fourteenth Amendment Was Equally-Populated Contiguous House Districts, as Congress Demonstrated Following Each Census After the Civil War.** ............................................... 10

  **C. The House Chamber Was Last Expanded In 1857, And Reached Physical Seating Capacity of 448 Seats, More Or Less, By 1913. Congress Modernized the Capitol Building in the 20th Century But Did Not Expand the House Chamber.** ........................................................................................... 12

  **D. 1920 to 2020 – Reapportioning "The Then Existing Number" [435] Using "The Method of Equal Proportions," Creating Clusters And Gaps.** . 14

    *1920 to 1930 – Codifying the Failure of 1920.* ............................................ 14

    *1940 to 2000 – Growing Population Inequality Among Inter-State House Districts.* .......................................................................................................... 17

    *'2 to 1' House District Inter-state Population Difference - 2010 to 2020.* ...... 19

**AUTHORITIES** ...................................................................................... 20

  **A. Standard of Constitutional Interpretation.** ......................................... 20

  **B. Discussion of Authorities Cited by Appellee.** ...................................... 22

    *Political.* ....................................................................................................... 22

    *Standing.* ....................................................................................................... 24

    *Federal.* ......................................................................................................... 28

**CONCLUSION** ....................................................................................... 29

# Table of Authorities

Cases

*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S.Ct. 2652 (2015).......................................................................................... 21

*Baker v. Carr*, 369 U.S. 186 (1962)......................................................................... 7

*Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853 (9th Cir. 2017) ..................... 28

*Carroll v. Becker*, 285 U.S. 380 (1932) ................................................................. 7

*Clemons v. Dept. of Commerce*, 710 F.Supp.2d 570 (N.D. Miss. 2010), vacated, 562 U.S. 1105 (2010)........................................................................................... 27

*Collins v. City of Harker Heights, Texas*, 503 U.S. 115 (1992)............................. 25

*Dept. of Commerce v. Montana*, 503 U.S. 442 (1992) ............................................ 5

*Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975) ..................... 25

*Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004) ........................ 26

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) .................................................. 25

*Galaza v. Mayorkas*, 61 F.4th 669 (9th Cir. 2023) ................................................ 29

*Gilligan v. Morgan*, 413 U.S. 1 (1973) ................................................................. 24

*Gravel v. U.S.*, 408 U.S. 606 (1972) ...................................................................... 25

*Hewitt v. Helms*, 482 U.S. 755 (1987) ................................................................... 25

*Hicks v. Miranda*, 422 U.S. 332 (1975).................................................................. 24

*Hollingsworth v. Perry*, 570 U.S. 693 (2013). ...................................................... 26

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020)........................................ 28

*Koenig v. Flynn*, 285 U.S. 375 (1932) ..................................................................... 7

*Lance v. Coffman*, 549 U.S. 437 (2007) ................................................................. 26

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ 26

*Mississippi v. Johnson*, 71 U.S. 475 (1866)........................................................... 24

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022)........ 21

*Prigg v. Pennsylvania*, 41 U.S. 539 (1842) ........................................................... 24

*Reynolds v. Sims*, 377 U.S. 533 (1964)................................................................... 22

*Rucho v. Common Cause*, 588 U.S. ___, 139 S.Ct. 2484 (2019) ........................... 24

*Shapiro v. McManus*, 577 U.S. 39 (2015)............................................................... 28

*Smiley v. Holm*, 285 U.S. 355 (1932) ..................................................................... 7

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ......................................................... 26

*Utah v. Evans*, 536 U.S. 452 (2002) ....................................................................... 21

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ................................................................. 23

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................................ 6

*Wisconsin v. City of New York*, 517 U.S. 1 (1996) ................................................ 28

## Statutes

2 U.S.C. § 2a(a) .................................................................................................. 29

## Other Authorities

'The Status of National Origins', June 14, 1929, Congressional Record [Senate], pp. 2904-2907.................................................................................................... 15

April 26, 1940, Congressional Record [Senate], p. 5059...................................... 17

Crocker, Royce, *The House of Representatives Apportionment Formula: An Analysis of Proposals for Change and Their Impact on States* at p. 19, Congressional Research Service (www.crs.gov), Library of Congress, Order Code R41382, August 26, 2010 ....................................................................... 20

Herbert, H.A., *The House of Representatives and the House of Commons*, North American Review, Mar. 1894, Vol. 158, No. 448, p. 266 .................................. 13

Huckabee, David C., *The House Apportionment Formula in Theory and Practice* at 2 n.1, CRS Report for Congress, Order Code RL30711, Library of Congress, October 10, 2000 (see www.crs.gov) ............................................................... 14

June 17, 1929, Congressional Record [Senate], p. 2941 ...................................... 15

June 18, 1929, Congressional Record [Senate], p. 3029...................................... 16

June 18, 1929, Congressional Record [Senate], pp. 3023-3024 ........................... 11

June 19, 1929, Congressional Record [House], p. 3288 ....................................... 16

June 19, 1929, Congressional Records [House], p. 3304...................................... 17

Petersen, Eric R., *Parliament and Congress: A Brief Comparison of the British House of Commons and the U.S. House of Representatives*, Congressional Research Service No. RL32206, May 19, 2005 (see www.crs.gov).................. 13

Rep. Daniel Webster, 1832, as quoted in Crocker, Royce, *The House of Representatives Apportionment Formula: An Analysis of Proposals for Change and Their Impact on States* at p.4, Congressional Research Service (www.crs.gov), Library of Congress, Order Code R41382, August 26, 2010 ...... 9

## Constitutional Provisions

Article I, § 2..........................................................................................5, 29

Article II, § 1 ........................................................................................... 5

U.S.CONST. Fourteenth Amend. § 2 (1868) ....................................................5, 10

U.S.CONST. Seventeenth Amend. § 1 (1913) ........................................................ 5

**SUMMARY**

Article I, § 2, of the Constitution, and § 2 of the Fourteenth Amendment, were understood by their drafters to require that each House member represent the same number of residents.

Article II, § 1, regarding the 'electoral college,' presumes each House member represents the same number of residents, and provides that each state is entitled to one elector for each Senator and Representative. Subsequent Amendments guarantee each citizen the "right to vote at any election for the choice of electors for President and Vice-President of the United States, [and] Representatives in Congress," and in elections for "two Senators from each State[.]" U.S.CONST. Fourteenth Amend. § 2 (1868); U.S.CONST. Seventeenth Amend. § 1 (1913).

From 1792 to 1913, House Seats, and later House Districts, were apportioned by equal ratios – each Member represented the same number of residents, first directly, and later through equal-population, contiguous districts.

Congress rejected the 1920 census and refused to reapportion between 1913 and 1929. In 1929, Congress thought it was creating a backstop, in the event a future Congress again refused to reapportion. Yet, in 1941, with little discussion, the backstop was converted into a permanent automatic process.

Since 1929, the "method of equal proportions," has been used to divide the "then existing number", 435, producing House districts with six-digit inter-state population variances. [ER-35-60]

*Dept. of Commerce v. Montana*, 503 U.S. 442 (1992), referenced in the Complaint [ER-60-61], only analyzed the claim that one seat should be taken from

Washington and given to Montana. *Id*. at 460-61. The Court held that Montana voters had standing, and that the subject matter – apportionment – is justiciable. *Id*. at 446 n.7, 458-59.

> Nevertheless, the reasons that supported the justiciability of challenges to state legislative districts … as well as state districting decisions relating to the election of Members of Congress … apply with equal force to the issues presented by this litigation. ... As our previous rejection of the political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary. ... The political question doctrine presents no bar to our reaching the merits of this dispute and deciding whether the District Court correctly construed the constitutional provisions at issue.

*Id*. at 458-59 (citations omitted).

The Court also held that the facts presented at the time, regarding the 1990 census, did not "establish a violation of the *Wesberry* standard." *Id*. at 461, 465-66.

*Wesberry v. Sanders*, 376 U.S. 1 (1964), held that a two-to-one population difference among legislative districts within a state was unconstitutional. *Id*. at 7.

Standing and justiciability for Appellant, an individual voter, are satisfied under *Montana* and *Wesberry*, which were brought by "citizens and qualified voters" who were "entitled to vote in congressional elections[.]" 376 U.S. at 2. A district court panel found that "the population of the Fifth District is grossly out of balance with that of the other nine congressional districts of Georgia," but dismissed the complaint nonetheless, in a 2-1 decision. *Id*. at 3-4. The *Wesberry* court reversed, holding,

> … that in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have

entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit.

376 U.S. at 4. *Wesberry* relied upon *Baker v. Carr*, 369 U.S. 186 (1962), which …
> held (1) that the District Court had jurisdiction of the subject matter; (2) that the qualified Tennessee voters there had standing to sue; and (3) that the plaintiffs had stated a justiciable cause of action on which relief could be granted. …
> *Smiley v. Holm*, 285 U.S. 355 [(1932)]; *Koenig v. Flynn*, 285 U.S. 375 [(1932)]; and *Carroll v. Becker*, 285 U.S. 380 [(1932)], concerned the choice of Representatives in the Federal Congress. *Smiley*, *Koenig* and *Carroll* settled the issue in favor of justiciability of questions of congressional redistricting. …
> **The right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I.** This dismissal can no more be justified on the ground of 'want of equity' than on the ground of 'non-justiciability.' We therefore hold that the District Court erred in dismissing the complaint.

*Wesberry*, 376 U.S. at 5-7 (emphasis added).

After the 1990 census, 37 states were assigned House districts of between 502,992 and 599,828 residents; 11 states were assigned House districts of between 600,542 and 699,999 residents; Wyoming [population 453,588] was assigned a house district of 455,975 residents; and Montana [population 799,065] was assigned a house district of 803,655 residents. [ER-58-60] For 48 states, the maximum difference in House district size was 197,007. The absolute difference was 345,477.

Since then, population growth, a fixed number of seats [435], and the "method of equal proportions" has produced a 500,000-resident gap between the smallest district assigned a state, and the largest district assigned a state; and the district sizes of the rest of the states are distributed across a much larger spread.

As applied to apportionment after the 2020 census, Montana [population - 1,084,225] has two (2) House districts comprised of 542,704 residents, while neighboring Idaho [population – 1,839,106] has two (2) house districts comprised of 920,689 residents. The largest house districts, Delaware [990,837] and Idaho [920,689], are twice the size of the smallest, Montana [542,704] and Rhode Island [549,082]; and the 'weight' of the average voter's vote is between 3/5ths and 3/4ths, as compared to the voters in the states with the five (5) smallest House districts. [See App. Br. at 34-35] Appellant, a Washington-resident voter, has .703 of a vote, as compared to a Montana-resident voter, in elections for the House and for the President. [Id.]

Population growth has not been equally distributed across the states. The "method of equal proportions" appeared to produce roughly equal House district sizes among most of the states, but it no longer does so. Since no two states have the same House district size, the 'electoral college', Article II, § 1, is significantly influenced by random chance, re-arranged once per decade.

The "method of equal proportions" was not the original intent of the framers of Article I, as demonstrated by Congress' implementation of Article I between 1792 and 1862. [ER-22-26] Nor was it the original intent of the framers of the 14th Amendment, as demonstrated by Congress' implementation of the 14th Amendment between 1872 and 1913. [ER 26-33]

The facts, and the population, have changed significantly since 1990. Using the "method of equal proportions" to reapportion "the then existing number" of

Representatives, as applied to the 2020 census, "establish a violation of the *Wesberry* standard."

## SUPPLEMENTAL HISTORY

### A. The Original Intent of The Framers of Article I Was For Every House Member To Represent The Same Number Of Residents, As Congress Demonstrated Following Each Census Until the Civil War.

> The Constitution, therefore, must be understood, not as enjoining an absolute relative equality, because that would be demanding an impossibility, but as requiring of Congress to make the apportionment of Representatives among the several states according to their respective numbers, as near as may be. That which cannot be done perfectly must be done in a manner as near perfection as can be.

Rep. Daniel Webster, 1832, as quoted in Crocker, Royce, *The House of Representatives Apportionment Formula: An Analysis of Proposals for Change and Their Impact on States* at p.4, Congressional Research Service (www.crs.gov), Library of Congress, Order Code R41382, August 26, 2010.

After each of the first five (5) censuses, the same language was employed in the respective apportionment acts, changing only the number:

> [T]he House of Representatives shall be composed of members elected agreeably to a ratio of one member for every [___] thousand persons in each state, computed according to the rule prescribed by the constitution[.] [ER-78-83]

After the sixth census, Congress used the same apportionment language, and added a 'greater fractions' method, a 'separate districts' requirement, and a 'contiguous territory' requirement:

> [T]he House of Representatives shall be composed of members elected agreeably to a ratio of one Representative for every seventy thousand six hundred and eighty persons in each State, and of one additional

representative for each State having a fraction greater than one moiety of the said ratio[.]…

And be it further enacted, That in every case where a State is entitled to more than one Representative, the number to which each State shall be entitled under this apportionment shall be elected by districts composed of contiguous territory equal in number to the number of Representatives to which said State may be entitled, no one district electing more than one Representative. [ER-84]

After the seventh census, the 1850 Act provided that the aggregate population of the United States "shall be divided by the number two hundred and thirty-three [233], and the product of such division … shall be the ratio, or rule of apportionment, of representatives among the several States[.]" [ER-85-93; 94] The number was then increased to 234. The ratio was one (1) Representative per 99,110 residents.

After the eighth census, the number was increased to 241, and the ratio was one (1) Representative per 130,470 residents. [ER-95]

## B. The Original Intent of the Framers of the Fourteenth Amendment Was Equally-Populated Contiguous House Districts, as Congress Demonstrated Following Each Census After the Civil War.

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State[.]" U.S.CONST. Fourteenth Amend. § 2 (1868). Each citizen has a "right to vote at any election for the choice of electors for President and Vice-President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof[.]" *Id*.

Congress used the same apportionment language after the ninth, tenth, eleventh, twelfth, and thirteenth censuses:

[T]he House of Representatives shall be composed of [____] members, to be apportioned among the several States[.] …

Congress shall be elected by Districts composed of contiguous territory, and containing as nearly as practicable an equal number of inhabitants[. The said districts shall be] equal in number to the Representatives to which such State may be entitled in Congress, no one District electing more than one Representative[.]

[ER-96, 99-100, 101, 104, 105-106]

- After the ninth census, the number was increased to 292, and the ratio was one (1) Representative per 132,049 residents.

- After the tenth census, the number was increased to 325, and the ratio was one (1) Representative per 154,428 residents.

- After the eleventh census, the number was increased to 356, and the ratio was one (1) Representative per 176,909 residents.

- After the twelfth census, the number was increased to 385, and the ratio was one (1) Representative per 197,440 residents.

- After the thirteenth census, the number was increased to 435, and the ratio was one (1) Representative per 212,019 residents.

According to a letter by Dr. Joseph A. Hill, "the expert assistant to the Director of the Census", entered into the Congressional Record by Sen. A.H. Vandenberg,

[T]he apportionment of Representatives in 1911, as based on the census of 1910, was made by the method which has since come to be known as the "method of major fractions" and is the only method to which that designation has ever been correctly applied.

June 18, 1929, Congressional Record [Senate], pp. 3023-3024.

**C. The House Chamber Was Last Expanded In 1857, And Reached Physical Seating Capacity of 448 Seats, More Or Less, By 1913. Congress Modernized the Capitol Building in the 20th Century But Did Not Expand the House Chamber.**

By 1807 construction on the south wing was sufficiently advanced that the House was able to occupy its new legislative chamber, and the wing was completed in 1811. …

[O]n August 24, 1814, British troops set fire to the building, and only a sudden rainstorm prevented its complete destruction. …

[T]he chambers for the Supreme Court, the House, and the Senate [were] ready for use by 1819. …

[B]y 1850 its size could no longer accommodate the increasing numbers of senators and representatives from newly admitted states. …

[T]he House of Representatives was able to meet in its new chamber on December 16, 1857[.] … The old House chamber was later designated National Statuary Hall. …The Capitol extensions were completed in 1868. …

Between July 1949 and January 1951 … The House and Senate chambers were completely remodeled, improvements such as modern air conditioning and lighting were added, and acoustical problems were solved. …

The Old Senate Chamber, National Statuary Hall, and the Old Supreme Court Chamber, on the other hand, were restored to their mid-19th-century appearance[.]

*History of the U.S. Capitol Building*, Architect of the Capitol.[1]

---

[1] https://www.aoc.gov/explore-capitol-campus/buildings-grounds/capitol-building/history

> The American practice of having desks and permitting members to read and write was defensible before Representatives voted themselves clerks, as they very properly did in the last Congress, as it was impossible for them to do their necessary correspondence without utilizing the hours of the session. Now it is hoped that in the near future desks will be removed, as nothing detracts so much from the respect the public ought to entertain for the House as the ragged appearance it ordinarily presents to the visitor.

Herbert, H.A., *The House of Representatives and the House of Commons*, North American Review, Mar. 1894, Vol. 158, No. 448, p. 266.

Once the House had grown to 435 voting members in 1913, there was no longer room for desks, which were replaced "by rows of conjoined, upholstered seats, similar to the seating in the Chamber today."[2] Presently, there are 448 physical seats on the House floor to accommodate all voting members and non-voting members.[3]

By way of comparison, the British House of Commons presently has 650 members. Petersen, Eric R., *Parliament and Congress: A Brief Comparison of the British House of Commons and the U.S. House of Representatives*, Congressional Research Service No. RL32206, May 19, 2005 (see www.crs.gov).

---

[2] https://history.house.gov/Exhibitions-and-Publications/Capitol/1857-1950/Furniture/
[3] https://web.archive.org/web/20090905185132/http://clerk.house.gov/art_history/art_artifacts/virtual_tours/house_chamber/index.html

**D. 1920 to 2020 – Reapportioning "The Then Existing Number" [435] Using "The Method of Equal Proportions," Creating Clusters And Gaps.**

*1920 to 1930 – Codifying the Failure of 1920.*

"In 1920, the Census Bureau did transmit apportionment counts to Congress, but Congress did not reapportion."[4] Since Congress in 1921 refused reapportionment by ignoring the 1920 census, a subsequent Congress in 1929 enacted what it considered to be a backstop, which would automatically conduct the apportionment process if a future Congress failed to act.

> …[I]n 1921 Harvard mathematician E.V. Huntington proposed the "equal proportions" method and developed formulas and computational tables for all of the other known, mathematically valid apportionment methods. A committee of the National Academy of Sciences conducted an analysis of each of those methods–smallest divisors, harmonic mean, equal proportions, major fractions, and greatest divisors–and recommended that Congress adopt Huntington's equal proportions method.

Huckabee, David C., *The House Apportionment Formula in Theory and Practice* at 2 n.1, CRS Report for Congress, Order Code RL30711, Library of Congress, October 10, 2000 (see www.crs.gov).

> In 1924 Congress passed the quota law which restricted immigration from all European countries to a definite number.
> …
> Many Members of the present Congress voted for this bill.
> …
> [T]he President issued the required proclamation declaring that on and after July 1, 1929, the new quota basis known as the national-origins basis should be employed to fix quotas and that the quotas of the respective countries would be changed as of July 1, 1929.
> …

---

[4] https://www.census.gov/data/tables/time-series/dec/apportionment-data-text.html

It will be noted that if the census of 1920 had been accepted Italy would have had a much larger quota than all of England, Scotland, North Ireland, and Wales. If the 1920 census had been accepted as a basis, the Italians in our country would to-day be clamoring for a repeal of the national origins law as discriminating against them.

…

It will also be noted that there was scarcely any Italian immigration before 1880. There was none in the Revolutionary period, but from 1900 to 1920 the Italian immigration exceeded all other countries. … The 1890 system counts only the foreign born. The descendants of those who fought with Washington or who signed the Declaration of Independence are not counted, but the foreigners who have just landed or been bootlegged into the country are counted.

…

It will be remembered that the negro population is not considered in computing quotas. The figures above given represent the total white population as shown in the 1920 census. From this is deducted the immigrants from the nonquota countries like Canada and Mexico.

…

Should Italy be assigned any portion of this number if there were no Italians here in colonial days? Should Sweden be assigned any portion of this number if there were no Swedish people in America then? Should Germany be allotted 30 per cent of this if the total number of Germans in the Colonies in colonial days was less than 10 per cent?

…

> We urge the extension of the quota system to all countries of North and South America from which we have substantial immigration and in which the population is not predominantly of the white race.

'The Status of National Origins', June 14, 1929, Congressional Record [Senate], pp. 2904-2907.

A few days later, the Senate considered "A joint resolution (S. J. Res. 62) proposing an amendment to the Constitution providing for the exclusion of aliens in the apportionment of Representatives among the several States[.]" June 17, 1929, Congressional Record [Senate], p. 2941.

On June 18, 1929, the following was entered into the Congressional Record:

…there are a number of southern Senators who voted recently to exclude aliens from the count for representation, in defiance of the first article of the Constitution, while they are at the same time willing to give their tacit approval to legislation in the South which deprives the negro of his constitutional right to vote under the terms of the fifteenth amendment. "Over both sections of the Constitution," [reported the article], "these Senators are willing to ride roughshod in their effort to preserve for a comparatively small number of white voters in the Sought representation in Congress out of all proportion to their number."

June 18, 1929, Congressional Record [Senate], p. 3029.

Regarding the Permanent Apportionment Act of 1929 [ER-107-113]:

The enactment of an apportionment law that will forever hereafter prevent a failure to reapportion under the Constitution is of itself a great achievement. For almost a decade Congress has failed to perform this plain constitutional duty, and there were the strongest reasons for fearing that, unless an anticipatory reapportionment law was passed before the 1930 census is taken, no reapportionment would be made for years to come, and never again without greatly increasing the size of the House. **With this law on the statute books if a future Congress charged with the duty of making a reapportionment shall fail in that duty the law we have enacted will automatically come into operation** and the apportionment will be made in accordance with this law.

June 19, 1929, Congressional Record [House], p. 3288 (emphasis added).

I disliked to support a measure which transferred to the executive branch a duty imposed by the Constitution on Congress, but **I found consolation in the fact that Congress will have three months to perform this duty, and not unless Congress fails again to act will the executive branch have the power to reapportion.** The outstanding feature of the legislation is that the House will be reapportioned on the basis of the census of 1930, and some thirty million people now residing in the large cities and now deprived of proper representation due to Congress failing to reapportion since 1911 will secure the representation to which they are entitled. From forty to

fifty representatives now credited to rural districts will be succeeded by representatives from urban centers, when the County is properly reapportioned. The influence of the Anti-Saloon League and kindred organizations prevented reapportionment in the past because the representatives of these organizations knew their influence was more pronounced among Congressmen elected from rural districts than among those elected from the cities.

June 19, 1929, Congressional Records [House], p. 3304 (emphasis added).

After the 1930 census, 47 states were assigned House districts of between 220,768 and 395,982 residents; and Nevada [population 91,058] was assigned a House district of 86,390 residents. [ER-36-39] Excepting Nevada, the maximum inter-state House district gap was 175,214 residents.

*1940 to 2000 – Growing Population Inequality Among Inter-State House Districts.*

[O]n April 25, 1940, the President … approved and signed … S. 2505[,] [a]n act to amend an act to provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of Representatives in Congress, approved June 18, 1929, so as to change the date of subsequent apportionments[.]

April 26, 1940, Congressional Record [Senate], p. 5059.

After the 1940 census, 47 states were assigned House districts of between 249,631 and 359,231 residents; and Nevada [population 110,247] was assigned a House district of 110,247 residents. [ER-39-41] Excepting Nevada, the maximum inter-state House district gap was 109,600.

After the 1950 census, 47 states were assigned House districts of between 266,621 and 395,948 residents; and Nevada [population 160,083] was assigned a House district comprised of 160,083 residents. [ER-43-45] Excepting Nevada, the maximum inter-state House district gap was 129,327.

After the 1960 census, 48 states were assigned House districts of between 303,461 and 484,633 residents; Nevada was assigned one district of 285,278; and Alaska was assigned one district of 226,167 residents. [ER-46-49] Excepting Nevada and Alaska, the maximum inter-state House district gap was 181,172 residents.

After the 1970 census, 36 states were assigned House districts of between 430,914 and 498,940 residents; seven (7) states were assigned House districts of between 304,067 and 392,451 residents; six (6) states were assigned House districts of between 503,160 and 551,928; and North Dakota [population 617,761] was assigned a House district of 624,181 residents. [ER-53-55] Excepting North Dakota, the maximum inter-state House district gap was 247,861.

After the 1980 census, 34 states were assigned House districts of between 504,128 and 595,225 residents; 12 states were assigned House districts of between 400,481 and 487,411 residents; Nevada and Montana were assigned House districts of 399,592 and 393,345 residents, respectively; and North Dakota and South Dakota were assigned House districts of 652,695 and 690,178 residents, respectively. [ER-55-58] Excluding the two (2) largest and the two (2) smallest, the maximum inter-state House district gap was still 194,744.

After the 1990 census, 37 states were assigned House districts of between 502,992 and 599,828 residents; 11 states were assigned House districts of between 600,542 and 699,999 residents; Wyoming [population 453,588], was assigned a house district of 455,975 residents; and Montana [population 799,065], was assigned

a house district of 803,655 residents. [ER-58-60] Excluding Wyoming and Montana, the maximum inter-state House district gap was still 197,007.

Until the year 2000, the last presidential election which produced a victor in the electoral college who had lost the popular vote was when Benjamin Harrison defeated Grover Cleveland in 1888. [ER-28] *Dept. of Commerce v. Montana*, *infra*, decided in 1992, never mentions Article II, § 1.

After the 2000 census, 41 states were assigned districts of between 604,359 and 691,764 residents; four (4) states were assigned districts of between 713,232 and 785,068 residents; three (3) states were assigned districts of between 524,831 and 586,385 residents; Wyoming [population 493,782] was assigned a district of 495,304 residents; and Montana [population 902,195] was assigned a district of 905,316 residents. [See App. Br. at 30-31]

As of 2000, the "method of equal proportions" needed nine (9) exceptions, just to be able to group 41 states' districts within 87,405 residents of each other.[5]

*'2 to 1' House District Inter-state Population Difference - 2010 to 2020.*

After the 2010 census, 30 states were assigned districts of between 700,029 and 786,750 residents; 15 states were assigned districts of between 610,608 and 694,826 residents; two (2) states were assigned districts of 527,624 and 568,300 residents, respectively; two (2) states were assigned districts of 994,416 and 900,877

---

[5] By way of comparison, constituencies in the United Kingdom "must have an electorate … that is no smaller than 69,724 and no larger than 77,062." https://boundarycommissionforengland.independent.gov.uk/2023-review/guide-to-the-2023-review-of-parliamentary-constituencies/page/3/

residents, respectively; and South Dakota was assigned a district of 819,761. [See App. Br. at 32-33]

States of different population sizes are distributed across the chart arbitrarily, because the total number, 435, is pre-determined, and the math is rounded differently for each state in service of preserving the number '435.' [Id.] See Crocker, Royce, *The House of Representatives Apportionment Formula: An Analysis of Proposals for Change and Their Impact on States* at p. 19, Congressional Research Service (www.crs.gov), Library of Congress, Order Code R41382, August 26, 2010.

After the 2020 census, 38 states were assigned districts of between 706,740 and 798,102 residents; four (4) states were assigned districts of between 643,503 and 689,545 residents; three (3) states were assigned districts of between 542,704 and 577,719 residents; three (3) states were assigned districts of between 818,813 and 897,523 residents; Idaho was assigned districts of 920,689 residents; and Delaware was assigned a district of 990,837 residents. [See App. Br. at 34-35]

As of 2020, the "method of equal proportions" needs 12 exceptions to be able to group 38 states' House districts within 91,362. The "method of equal proportions" is a misnomer.

## AUTHORITIES
### A. Standard of Constitutional Interpretation.

"Our precedents new and old have employed this structural method of interpretation to read the Constitution in the manner it was drafted and ratified—as a unified, coherent whole." *Arizona State Legislature v. Arizona Independent*

*Redistricting Commission*, 135 S.Ct. 2652, 2680 (2015) (Roberts, C.J., dissenting)

(citations omitted).

> We should be guided, therefore, by the Census Clause's "original meaning, for '[t]he Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now.'"

*Utah v. Evans*, 536 U.S. 452, 491-92 (2002) (citations omitted) (Thomas, J. concurring in part and dissenting in part).

"[W]hen it comes to interpreting the Constitution, not all history is created equal. 'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' The Second Amendment was adopted in 1791; the Fourteenth in 1868." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 34 (2022) (citation omitted) (italics in original).

In the present case, acts of Congress subsequent to 1791 and 1868 are likewise at issue.

> We have long relied on contemporaneous constructions of the Constitution when interpreting its provisions, for "early congressional enactments 'provid[e] "contemporaneous and weighty evidence" of the Constitution's meaning.'" "This Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given its provisions[.]"

*Utah v. Evans*, 536 U.S. at 503-04 (citations omitted) (Thomas, J. concurring in part and dissenting in part).

**B. Discussion of Authorities Cited by Appellee.**

The authorities cited by Appellee have been divided into three categories: ''Political', 'Standing', and 'Federal'.

*Political.*

Citing *Baker v. Carr*, *supra*, Appellee contends the instant matter is a political question. Baker held the opposite: "An unbroken line of our precedents sustains the federal courts' jurisdiction of the subject matter of federal constitutional claims of this nature." 369 U.S. at 201. "It appears from the record that 37% of the voters of Tennessee elect 20 of the 33 Senators while 40% of the voters elect 63 of the 99 members of the House." *Id*. at 253. "Since discrimination is present among counties of like population, the plan is neither consistent nor rational." *Id*. at 256. This violated the individual voters' Fourteenth Amendment rights. *Id*. See, also, *Reynolds v. Sims*, 377 U.S. 533, 540 (1964).

Apportionment such that certain House districts had two to three times as many residents as others violates Article I, § 2, and § 2 of the Fourteenth Amendment. *Wesberry v. Sanders*, 376 U.S. at 7.

> A single Congressman represents from two to three times as many Fifth District voters as are represented by each of the Congressmen from the other Georgia congressional districts. The apportionment statute thus contracts the value of some votes and expands that of others. If the Federal Constitution intends that when qualified voters elect members of Congress each vote be given as much weight as any other vote, then this statute cannot stand. …
> We hold that, construed in its historical context, the command of Art. I, s 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional

election is to be worth as much as another's. … It would be extraordinary to suggest that in such statewide elections the votes of inhabitants of some parts of a State, for example, Georgia's thinly populated Ninth District, could be weighted at two or three times the value of the votes of people living in more populous parts of the State[.] … We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants. To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected 'by the People,' a principle tenaciously fought for and established at the Constitutional Convention. The history of the Constitution, particularly that part of it relating to the adoption of Art. I, s 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives.

*Wesberry*, 376 U.S. at 7-9.

The delegates were quite aware of what Madison called the 'vicious representation' in Great Britain whereby 'rotten boroughs' with few inhabitants were represented in Parliament on or almost on a par with cities of greater population. Wilson urged that people must be represented as individuals, so that America would escape the evils of the English system under which one man could send two members of Parliament to represent the borough of Old Sarum while London's million people sent but four. The delegates referred to rotten borough apportionments in some of the state legislatures as the kind of objectionable governmental action that the Constitution should not tolerate in the election of congressional representatives.

*Wesberry*, 376 U.S. at 14-15.

*Vieth*, cited by Appellee, held that political gerrymandering claims are not justiciable. *Vieth v. Jubelirer*, 541 U.S. 267 (2004).

*Rucho*, cited by Appellee, held that partisan gerrymandering is a political question. But, citing *Wesberry*, the *Rucho* court confirmed that "one-person, one-

vote' claims are not a political question and remain justiciable. *Rucho v. Common Cause*, 588 U.S. ___, 139 S.Ct. 2484, 2495-96 (2019).

In *Gilligan*, cited by Appellee, the Court held that the training, weaponry, and standing orders of the Ohio National Guard are not justiciable, but are reserved for the legislature and the executive branches. *Gilligan v. Morgan*, 413 U.S. 1 (1973).

*Hicks*, cited by Appellee, is a First Amendment / obscenity case. "On November 23 and 24, 1973, pursuant to four separate warrants issued seriatim, the police seized four copies of the film 'Deep Throat'[.]" *Hicks v. Miranda*, 422 U.S. 332, 334 (1975).

*Prigg v. Pennsylvania*, 41 U.S. 539 (1842), cited by Appellee, is a fugitive slave case which predates the Fourteenth Amendment, and is not pertinent to the analysis of equal representation in the House.

*Mississippi v. Johnson*, 71 U.S. 475 (1866), cited by Appellee, regards the Reconstruction Acts, and predates the Fourteenth Amendment, so is not pertinent to the analysis of equal representation in the House.

*Standing.*

*Dept. of Commerce v. Montana*, referenced in the Complaint [ER-60-61], found individual voters had standing, that the matter was justiciable, and not subject to the political question doctrine. On the merits, *Montana* held that under the facts presented, regarding the 1990 census, "it is by no means clear that the facts here establish a violation of the *Wesberry* standard." 503 U.S. at 461.

In the present as-applied challenge, the facts of the 2020 census do "establish a violation of the *Wesberry* standard." *Id*. [See ER-72-76]

*Franklin*, cited by Appellee here, "… challenged the decision to allocate federal overseas employees, and the method used to do so, as inconsistent with the APA and with the constitutional requirement that the apportionment of Representatives be determined by an 'actual Enumeration' of persons 'in each State.'" *Franklin v. Massachusetts*, 505 U.S. 788, 795 (1992). *Wesberry* (and *Montana*) specifically state that the injury of vote dilution or disenfranchisement is redressable via declaratory judgment. See 376 U.S. at 4.

In *Gravel*, cited by Appellee here, a Senate aid had no privilege to avoid giving testimony to a federal grand jury investigating the release and dissemination of the Pentagon Papers. *Gravel v. U.S.*, 408 U.S. 606 (1972).

In *Eastland*, cited by Appellee, a congressional subpoena was not subject to judicial intervention. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491 (1975).

Appellee cites *Hewitt*, which holds that the losing party cannot be retroactively determined "prevailing," for purposes of attorney fee shifting in a civil rights case. *Hewitt v. Helms*, 482 U.S. 755 (1987).

Appellee cites *Collins*, a wrongful death claim by the estate of a city employee brought under §1983, in which the court found no due process violation. *Collins v. City of Harker Heights, Texas*, 503 U.S. 115 (1992).

*Lujan*, cited by Appellee, concerned standing for environmental groups who challenged a regulation by the Secretary of the Interior requiring other agencies to

confer with that office regarding the Endangered Species Act. *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

Appellee cites Newdow, in which the non-custodial parent of school student lacked legal authority over his daughter, and therefore lacked standing to sue on her behalf contesting a requirement to stand and recite the Pledge of Allegiance. *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 14-15 (2004).

Appellee cites *Lance*, in which the plaintiffs, who did not participate in proceedings which resulted in a Colorado Supreme Court decision, did not have standing to challenge said decision via a new action filed in federal district court. *Lance v. Coffman*, 549 U.S. 437 (2007).

Appellee cites *Hollingsworth*, under which initiative supporters who intervened before the District Court did not have standing to appeal the District Court's decision that California Proposition 8 was unconstitutional, as the state declined to appeal. *Hollingsworth v. Perry*, 570 U.S. 693 (2013).

Appellee cites *Spokeo*, under which the 'mere allegation' of a bare procedural violation of the Fair Credit Reporting Act was insufficiently pleaded for federal question jurisdiction. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

In *Clemons*, cited by Appellee, the court explained that,

The Plaintiffs find *Montana* to be little guidance, because the validity of having a fixed number of Representatives was not addressed in Montana. That is certainly true.
…
In *Montana*, if the method of equal proportions had caused much greater disparities than some other method, then a challenge would have

had facts to support judicial adjustments at the margins of apportionment.

*Clemons v. Dept. of Commerce*, 710 F.Supp.2d 570, 588-89 (N.D. Miss. 2010), vacated, 562 U.S. 1105 (2010).

In the present case, this "challenge" does have the facts to support judicial adjustments of the entire permanent reapportionment scheme, to bring it back in line with the constitutional requirement of equal inter-state House district sizes, "as near as may be".

[The Census] Clause reflects several important constitutional determinations: that comparative state political power in the House would reflect comparative population, not comparative wealth; that comparative power would shift every 10 years to reflect population changes; that federal tax authority would rest upon the same base; and that Congress, not the States, would determine the manner of conducting the census.

*Utah v. Evans*, 536 U.S. at 477 (citations omitted).

The Constitution apportions power among the States based on their respective populations; consequently, changes in population shift the balance of power among them. Mindful of the importance of calculating the population, the Framers chose their language with precision, requiring an "actual Enumeration," U.S. Const., Art. I, § 2, cl. 3. They opted for this language even though they were well aware that estimation methods and inferences could be used to calculate population.

*Utah v. Evans*, 536 U.S. at 488-89 (Thomas, J., concurring in part and dissenting in part).

*Federal.*

*Wisconsin*, cited by Appellee, held that the Secretary of Commerce's decision to not statistically adjust the 1990 census for differential undercounting was within his constitutional discretion. *Wisconsin v. City of New York*, 517 U.S. 1 (1996).

In *Shapiro*, cited by Appellee, the Court considered "under what circumstances, if any, a district judge is free to 'determin[e] that three judges are not required' for an action 'challenging the constitutionality of the apportionment of congressional districts.'" *Shapiro v. McManus*, 577 U.S. 39, 40 (2015).

"This Court has stressed repeatedly that a law's virtues as a policy innovation cannot redeem its inconsistency with the Constitution. 'Failure of political will does not justify unconstitutional remedies.' *Arizona State Legislature*, 135 S.Ct. at 2690 (Roberts, C.J., dissenting) (citations omitted).

Appellee cites *Bayer*, which held that requiring an employee to be bound by arbitration agreement violated his rights under the Americans with Disabilities Act, and the availability of nominal damages avoided dismissal for mootness. *Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853 (9th Cir. 2017).

Appellee cites *Juliana*, in which Plaintiffs, who sued for an injunction prohibiting fossil fuel use, met some elements of standing, but the court "doubt[ed] that any such plan can be supervised or enforced by an Article III court." *Juliana v. United States*, 947 F.3d 1159, 1173 (9th Cir. 2020).

Finally, Appellee cites *Galaza*, which affirmed dismissal of action by TSA employee alleging discrimination, because the Aviation and Transportation Security

Act preempts the Rehabilitation Act. *Galaza v. Mayorkas*, 61 F.4th 669, 670 (9th Cir. 2023). *Galaza* is immaterial.

Whether 2 U.S.C. § 2a(a) violates Article I, § 2, of the Constitution, and § 2 of the Fourteenth Amendment, as applied, is a substantial question of federal law.

## CONCLUSION

The present case concerns population inequality among congressional districts - malapportionment. It does not concern partisan gerrymandering, nor does it concern racial gerrymandering. None of the above-discussed authorities is relevant to the issues presented.

Presently, no two states have House districts with the same number of residents. This is the opposite of the stated intent of the Framers as expressed through Congressional enactments from 1792-1862, and from 1872-1913, that each House member from every state represents the same number of residents.

Under *Wesberry* and *Montana*, Appellant has standing to assert this claim of population inequality among congressional districts; the harm, population inequality among congressional districts, is justiciable because the problem can be analyzed using official census data; and the Court holding 2 U.S.C. § 2a(a) and (b) unconstitutional as applied would remedy the present and ongoing 'vote dilution' harm suffered by Appellant and all other voters.

The decision of the district court dismissing Appellant's Complaint should be reversed.

Filed this 1st day of February, 2024,

                                    **KSB LITIGATION, P.S.**

By: s/ William C. Schroeder_____
510 West Riverside Ave., Suite 300
Spokane, Washington, 99201
wcs@KSBLit.legal
(509) 624-8988
Appellant

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-35606

I am the attorney or self-represented party.

**This brief contains** 6,555 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ William C. Schroeder **Date** 02/01/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*